# United States Court of Appeals
## For the First Circuit

No. 11-1115

UNITED STATES OF AMERICA,

Appellee,

v.

ZHEN ZHOU WU, a/k/a ALEX WU,

Defendant, Appellant.

No. 11-1141

UNITED STATES OF AMERICA,

Appellee,

v.

YUFENG WEI, a/k/a ANNIE WEI,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch, Chief Judge,
Souter,* Associate Justice,
and Selya, Circuit Judge.

Michael R. Schneider and Alan M. Dershowitz with whom Jeffrey
G. Harris and Salsberg & Schneider were on brief for appellant Zhen
Zhou Wu, a/k/a Alex Wu.

*Hon. David H. Souter, Associate Justice (Ret.) of the Supreme
Court of the United States, sitting by designation.

    Nathan Z. Dershowitz with whom Amy Adelson and Dershowitz Eiger & Adelson, P.C. were on brief for appellant Yufeng Wei, a/k/a Annie Wei.

    Stephan E. Oestreicher, Jr., Appellate Section, Criminal Division, Department of Justice, with whom Lanny A. Breuer, Assistant Attorney General, Criminal Division, John D. Buretta, Acting Deputy Assistant Attorney General, Criminal Division, Carmen M. Ortiz, United States Attorney, B. Stephanie Siegmann and John A. Capin, Assistant United States Attorneys, were on brief for appellee.

———————————

March 19, 2013

———————————

      **LYNCH**, **Chief Judge**.  This case involves criminal laws meant to protect the security of the United States and rights guaranteed to criminal defendants by the Constitution.

      In 1976, Congress passed the Arms Export Control Act ("AECA"), giving the President broad authority to regulate the shipment of defense articles to foreign destinations "[i]n furtherance of world peace and the security and foreign policy of the United States."  22 U.S.C. § 2778 (2006).  Three years later, Congress further authorized the President to restrict the export of "dual-use" technologies that serve both military and nonmilitary purposes.  50 U.S.C. app. §§ 2401(5), 2402(2)(A).  Individuals who violate either set of export restrictions may be fined up to $1 million and imprisoned for up to 20 years.  22 U.S.C. § 2778(c); 50 U.S.C. § 1705(c).  The resulting regulatory scheme is intricate, in order to combat the sophisticated weapons dealers whose activities undermine U.S. interests.

      The case at hand involves two defendants prosecuted and convicted on charges of violating restrictions on the overseas shipment of weapons-grade technologies.  From 1996 until 2008, Zhen Zhou Wu and Yufeng Wei shipped tens of millions of dollars worth of sophisticated electronic components from the United States to China, with little regard for whether the parts that they sold were export-controlled.  On appeal, Wu and Wei launch a broad-based attack on the federal government's arms export control system--a

regulatory scheme that, they say, violates the Fifth Amendment's Due Process Clause. We reject this attack. However, on two counts of conviction, charging Wu and Wei with exporting items restricted under the U.S. Munitions List, we find that the district court erred in its instructions by not submitting to the jury an element of the offense--an error that violated the defendants' Sixth Amendment right to a trial by jury and has not been shown to be harmless. Accordingly, we affirm Wu's conviction on 15 of the 17 counts, affirm Wei's conviction on 11 of the 13 counts, and vacate the convictions of each defendant on two counts. We remand for resentencing.

I.

A.  Background

Zhen Zhou Wu and Yufeng Wei, both Chinese nationals, married in China in 1988. Afterward, they each pursued graduate degrees in the United States. In 1996, Wu returned to China to found the Chitron Electronics Company Limited in Shenzhen ("Chitron-Shenzhen"). Chitron-Shenzhen served as an electronic-parts broker, purchasing components from international suppliers and then selling them to customers in China. It specialized in military and industrial parts.

The same year that Wu founded Chitron-Shenzhen, he also opened a branch purchasing office for the company in Massachusetts called "Perfect Science and Technology" and employed Wei to run the

-4-

office.  Wei ran Perfect Science as a sole proprietorship under her own name.  In early 1998, Wu incorporated the office as "Chitron Electronics, Inc." ("Chitron-US"), with Wu as the corporation's president and Wei as its business and finance manager.  Throughout this period, Wei oversaw the purchase of parts from vendors in the United States and the shipment of those parts to Chitron's customers in China.  Wu and Wei divorced in 1999, although their working relationship continued throughout the period covered in the indictment.

Wu oversaw the business from Shenzhen.  Once a year, he traveled to the United States to visit the Chitron-US office, and he remained in daily contact with Wei throughout the year, coordinating the activities of Chitron-US through electronic tasking lists and an online database system.  Meanwhile, Wei worked as office manager of the Chitron-US branch, a role she served in until 2007, when Stephen Gigliotti took over that position.  By that time, Chitron had five offices--three in China, one in Hong Kong, and one in the United States--and over 200 employees.  Each year, the company purchased tens of thousands of parts, worth tens of millions of dollars, from dozens of U.S. suppliers.

Nearly all of Chitron's customers were located in mainland China.  Before 2005, Chitron-US would ship orders to

freight forwarders[1] in Hong Kong, who then repackaged the items and sent them along to Chitron-Shenzhen, where they were inspected and then finally sent to their ultimate recipients in China. In 2005, Chitron established its own one-room branch office in Hong Kong, staffed by a single part-time employee who traveled to Hong Kong a few days a week while working full-time in Shenzhen. Thereafter, Chitron-US exported parts directly to Chitron's Hong Kong office, which then forwarded the orders to Chitron-Shenzhen. Wu and Wei claimed that they shipped parts through Hong Kong because it was cheaper than sending them directly to China.

Before exporting parts from the United States, a Chitron-US employee--usually Wei--would prepare a "Shipper's Export Declaration" ("SED"), as required by the Commerce Department's Foreign Trade Regulations. See 15 C.F.R. § 30.2(a)(1); see also 13 U.S.C. § 301. Wei always entered the code "NLR" ("no license required") on the forms to indicate that no export licenses were required for the goods that Chitron-US was shipping. Wei also listed "Hong Kong" as the "country of ultimate destination" for the parts, and entered the names of the freight forwarders--and later Chitron's Hong Kong office--as the parts' "ultimate consignee."

---

[1] A "freight forwarder" is "a transportation broker who assembles and consolidates numerous small shipments into one large load, arranges for long-haul transportation of the consolidated shipment, breaks the consolidated load into small individual shipments, and delivers those packages to the ultimate consignees." Regular Common Carrier Conference v. United States, 793 F.2d 376, 378 (D.C. Cir. 1986) (Scalia, J.).

How much Wu and Wei actually knew about the United States' export control regime was hotly contested at trial. Wu occasionally presented himself to customers as an export compliance expert with a specialty in military products. According to Chitron staff, for most of its history the company had no export compliance policy, nor did it give any compliance training to its employees.

Nevertheless, as early as 1996, someone at Chitron-US had printed out pages from the Commerce Department's Export Administration Regulations ("EAR"), 15 C.F.R. pts. 730-774, and placed them into a folder labeled "export" inside a box marked "Wu files." Communications between Wu and Wei around this time also evidence that the two were aware of legal restrictions on the export of certain electronics to China. In April 1997, Wei told Wu in an e-mail that she had learned from United Parcel Service that she was required by law to obtain an export license in order to ship a certain part. That same month, Wei also told Wu that a vendor had refused to sell to her after she mentioned that her customer was in China, and that the "big lesson" from this "mistake" was to avoid providing "extra" information to vendors. Wu agreed, suggesting that Wei not tell suppliers that she sold parts to China, and later instructing that she should simply avoid telling suppliers that she exported parts at all.

Beginning in 2000, Chitron's lack of export licenses for its products became a bigger and bigger concern for the company.

-7-

In 2001 and 2002, Maylyn Atkinson Murphy, a Chitron-US employee, repeatedly told Wu that vendors had begun to ask for "end user information," such as where Chitron would be shipping the parts and whether those parts would be used with products that had military applications.   In response, Wu explained to Murphy that his priority was to "get business done" while avoiding "trouble if the parts are really sensitive and defense related."  He told her that "[t]he key is to avoid submitting end user information and get the [p]arts ordered," and suggested that if vendors asked her, she should tell them that she did "not know where the parts ship."

In August 2002, Wei raised similar concerns with Wu: she said that she was worried about shipping a part that was "not for exporting [to] China" and that she feared there might be "some strict rule from [C]ustom[s] if they see the part number."  Wei suggested to Wu that she could instead enter a different part number on the shipping documents.

In June 2003, a vendor at an electronics trade show told Wei that she would be interested in doing business with Chitron "provided you guys can, you know, supply the export license[s]. You are supplying the export licenses, are[n't] you?" According to Murphy, Wei said "yes," even though Chitron had never obtained, nor ever even applied for, an export license for any part.  Wei later e-mailed Wu about the exchange, telling him that the vendor had "realized that we export most [of] their products to China," that

-8-

"all their items (or most) should have [a] license for exporting,"
and that "they became susp[i]cious how we file the application or
forms for exporting."  She warned Wu that it would be difficult to
obtain parts from that vendor in the future, due to "exporting
getting more strict, especially to China."

     As more and more vendors discovered that Chitron planned
to ship parts to China, and as the vendors refused to sell to
Chitron unless it obtained export licenses, Chitron-US
staff--including Wei--began to note these so-called "problem
orders" in the tasking lists.  By 2005, vendors were telling Murphy
"every day" that Chitron needed export licenses to ship the parts
it wanted to China; Murphy would then relay these messages to Wei,
who would inform Wu.  Several Chitron-US employees raised concerns
about export restrictions with Wei, especially those regarding the
shipment of military parts to China, but according to the
employees' testimony, Wei either "laughed them off" or accused them
of "insubordination."

     In a 2005 performance review, Wu expressed disappointment
that Murphy had failed to reach her "minimum purchases."  Murphy
explained that it had been difficult for her to keep her numbers up
"because a lot of our vendors require export licensing."  She left
the company a few months later, in part because she "didn't think
they were doing the right thing."  In 2007, Gigliotti attended a
day-long informational meeting on export compliance, and he was

"shaken up" by what he learned there about the liability he and Chitron could face for their past conduct. He called Wu that evening and told Wu that "we have to redo the entire workflow process in the company to make sure that we're abiding by the laws." A few days later, Gigliotti met with Wu in person to discuss a proposal Gigliotti had drafted for how Chitron could ensure its compliance with U.S. export laws. Wu responded that Gigliotti was "overreacting" due to Gigliotti's "personal political beliefs," that the export laws did not apply to Chitron because it shipped to Hong Kong rather than to China, and that Gigliotti's proposals would be too expensive and affect too much of Chitron's business.

When Gigliotti raised the issue with Wu once more in October 2007, Wu again accused Gigliotti of overreacting, emphasizing that Gigliotti's priority was to "keep the U.S. office running profitably." Wu added: "I'm not afraid to go to jail. Are you?" Gigliotti quit the next day.

Only after Gigliotti's resignation did Wu implement some export compliance measures, which included a formal process for checking to see whether parts were export-controlled, export-law training for Chitron personnel, and the appointment of Chitron-US employee Bo Li as "compliance officer."

B. <u>Charges</u>

In 2008, Wu and Wei were arrested and later indicted for 34 counts of export-related offenses. After a 23-day jury trial and various post-trial motions, the two were ultimately convicted as follows:

-<u>The Munitions List Counts</u>: Both Wu and Wei were convicted on two counts for, on two occasions in June 2006, exporting to China without a license "phase shifters" that are designated as defense articles on the U.S. Munitions List, 22 C.F.R. pt. 121.

-<u>The Commerce Control List Counts</u>: Both Wu and Wei were convicted on seven counts, and Wu was convicted on five additional counts, for, on various occasions between May 2004 and May 2007, exporting to China without a license electronic converters that are controlled under the Commerce Control List, 15 C.F.R. pt. 774.

-<u>The Conspiracy Count</u>: Both Wu and Wei were convicted under 18 U.S.C. § 371 on one count of conspiracy to violate both the Munitions List and Commerce Control List restrictions.

-<u>The SED Counts</u>: Both Wu and Wei were convicted on two counts for conspiring to file materially false Shipper's Export Declarations with the Commerce Department by misstating the ultimate recipients and destinations of their exports, in violation of 18 U.S.C. § 371, and for devising a scheme to falsify or conceal material facts in a matter within the jurisdiction of the United States, in violation of 18 U.S.C. § 1001(a)(1).

-<u>The Immigration Count</u>: Finally, Wei was convicted on one count for making material false statements in an immigration application, in violation of 18 U.S.C. § 1546(a).

-11-

Wu and Wei were acquitted on several additional counts. Wu was sentenced to 97 months in prison, and Wei was sentenced to 36 months.

## II.

### A. Munitions List Counts

On the Munitions List counts, the prosecution alleged that Wu and Wei twice unlawfully exported "phase shifters"[2] to China without a license. See 22 U.S.C. § 2778(b)(2); 22 C.F.R. pt. 121. Wu and Wei argue that the Munitions List convictions should be reversed because the Munitions List restrictions are unconstitutionally vague. In the alternative, they argue that their convictions should be vacated because the jury instructions were fatally flawed.[3] We consider both arguments de novo. See Uphoff Figueroa v. Alejandro, 597 F.3d 423, 434 (1st Cir. 2010) (jury instructions); United States v. Lachman, 387 F.3d 42, 50 (1st Cir. 2004) (vagueness). We reject the constitutional vagueness argument, but we agree that the jury instructions were flawed and so vacate the convictions on the Munitions List counts. We address

---

[2]Two waves are said to be "out of phase" when they have the same frequency but reach their peaks at different points. A phase shifter can change the phase of one of the two waves so that the waves exactly line up with one another (or, vice versa, so that waves that were previously "in phase" no longer line up with one another). See generally Weisman, The Essential Guide to RF and Wireless, at fig. 4-23 (2d ed. 2002).

[3]Wu and Wei also raise several additional challenges to the Munitions List convictions, but we need not reach them because we vacate the convictions due to the flawed jury instructions.

Wu and Wei's constitutional arguments inasmuch as they affect the scope of the remand. Compare Burks v. United States, 437 U.S. 1, 11 (1978) (retrial barred by Double Jeopardy Clause if evidence supplied by the government would be legally insufficient to sustain conviction), with United States v. Urciuoli, 513 F.3d 290, 297 (1st Cir. 2008) (new trial permissible where error is confined to jury instructions), cert. denied, 131 S. Ct. 612 (2010).

Statutory and Regulatory Framework. The Arms Export Control Act authorizes the President "to control the import and the export of defense articles." 22 U.S.C. § 2778(a)(1). Under the AECA, the President may "designate those items which shall be considered as defense articles" and "promulgate regulations for the import and export of such articles." Id. The President has delegated this responsibility to the State Department. Exec. Order No. 11,958, 42 Fed. Reg. 4311 (Jan. 18, 1977).

A designated "defense article" may not be exported from the United States without a license from the State Department. See 22 U.S.C. § 2778(b)(2). The AECA criminalizes "willful[]" violations of this export license requirement. Id. § 2778(c). The AECA further provides that the designation of an item as a "defense article[]" made via "regulations issued under [the statute] . . . shall not be subject to judicial review." Id. § 2778(h). Because the United States suspended munitions exports to China after the Tiananmen Square killings in 1989, the State

-13-

Department will not grant a license to export defense articles to
that country.  See 22 C.F.R. § 126.1(a); Suspension of Munitions
Exports to PRC, 54 Fed. Reg. 24,539 (June 7, 1989); see also United
States v. Holmquist, 36 F.3d 154, 157 (1st Cir. 1994), cert.
denied, 514 U.S. 1084 (1995).

Pursuant to the President's authority under the AECA, the
State Department has promulgated the International Traffic in Arms
Regulations ("ITAR"), 22 C.F.R. pts. 120-130, which include the
U.S. Munitions List, id. pt. 121.  The Munitions List is not a
compendium of specific controlled items; instead, it is a series of
categories describing the kinds of items that qualify as "defense
articles" requiring export licenses.  The Munitions List contains
"attributes rather than names," and for good reason.  As has been
explained:

> [A]n effort to enumerate each item would be
> futile, not only because some are bound to be
> overlooked (imagine a regulation that tried to
> list all bicycles by manufacturer and model
> number) but also because manufacturers change
> their designations.  The Mark 4 may be
> succeeded by a Mark 5, or the CQ/T model may
> become the CQ/X.

United States v. Pulungan, 569 F.3d 326, 328 (7th Cir. 2009)
(Easterbrook, C.J.).

A manufacturer unsure about whether a particular item is
a "defense article" covered by the Munitions List may file a
"commodity jurisdiction" (CJ) request with the State Department.
The determination is made by the Directorate of Defense Trade

-14-

Controls within the State Department, in consultation with the Departments of Defense and Commerce, as well as other government agencies and industry. See 22 C.F.R. § 120.4.[4] These CJ determinations are never officially published in regulations or other government pronouncements.

The specific phase shifters at issue in this case were both made by M/A-Com, formerly a subsidiary of Tyco Electronics, and bore the product numbers "MAPCGM0003" and "MAPCGM0002." The government alleges that these phase shifters fell under Category XI(c) of the Munitions List. That category covers "[c]omponents, parts, accessories, attachments, and associated equipment specifically designed or modified for use with the equipment in [Categories XI(a) and XI(b)], except for such items as are in normal commercial use." 22 C.F.R. § 121.1(c)(XI)(c).[5]

Vagueness. At the outset, we address the defendants' argument that this carefully crafted regulatory scheme--which has

_____

[4]Nothing in the relevant regulation states that manufacturers are the only parties that can submit CJ requests, see 22 C.F.R. § 120.4, although the State Department "prefer[s] that the manufacturer submit the request because of the background and sales information required." U.S. State Dep't, Directorate of Defense Trade Controls, Commodity Jurisdiction (CJ) FAQs (Oct. 2011), available at http://www.pmddtc.state.gov/faqs/documents/FAQ_CJ.pdf.

[5]Categories XI(a) and XI(b), in turn, contain examples of products that qualify as "[e]lectronic equipment . . . specifically designed, modified or configured for military application," ranging from "underwater acoustive active and passive countermeasures" to systems "[d]esigned or modified using burst techniques . . . for intelligence, security or military purposes." 22 C.F.R. § 121.1(c)(XI)(a), (a)(2), (b)(2).

remained in place for more than a quarter century--is unconstitutionally vague. The Fifth Amendment's Due Process Clause requires that "a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal." Buckley v. Valeo, 424 U.S. 1, 77 (1976) (per curiam); see also United States v. Anzalone, 766 F.2d 676, 678 (1st Cir. 1985). The "void for vagueness doctrine" addresses at least two discrete due process concerns: "first, . . . regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." FCC v. Fox Television Stations, Inc., 132 S. Ct. 2307, 2317 (2012).

Wu and Wei emphasize only the first of these two concerns, and appropriately so, since Munitions List Category XI(c), when placed within its larger regulatory framework, sets forth reasonably precise standards for enforcement. To be within the reach of the Munitions List at all, an item must qualify as a "defense article," a term defined by the ITAR with considerable specificity.[6] Moreover, the particular Munitions List category at

---

[6]"An article . . . may be designated or determined in the future to be a defense article . . . if it: (a) Is specifically designed, developed, configured, adapted, or modified for a military application, and (i) Does not have predominant civil applications, and (ii) Does not have performance equivalent (defined by form, fit and function) to those of an article or service used for civil applications; or (b) Is specifically

issue in this case--Category XI(c)--ties its coverage to Categories XI(a) and XI(b), which in turn contain specific examples of electronic systems and components covered by the ITAR. See supra note 5. And to ensure that the regulation does not ensnare unwitting exporters selling to non-military clients, Category XI(c) also explicitly excludes items "in normal commercial use." 22 C.F.R. § 121.1(c)(XI)(c).

All together, this framework provides specific guidance that would allow individuals and law enforcement officials alike to determine whether the phase shifters fall within Category XI(c). At trial, both the government and the defendants presented expert testimony regarding the design and the use of phase shifters; on this basis the jury could have made discrete factual determinations on the matter. Granted, the evidence presented at trial could support alternative interpretations, yet "a regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." Fox Television Stations, Inc., 132 S. Ct. at 2317. Here, it is quite clear what specific facts would determine whether the phase shifters fall within Category XI(c): whether they were designed for military use; whether they are used in conjunction with the

---

designed, developed, configured, adapted, or modified for a military application, and has significant military or intelligence applicability such that control under this subchapter is necessary." 22 C.F.R. § 120.3.

items described in Categories XI(a) and (b); and whether they are also amenable to normal commercial uses that would take them outside the scope of the ITAR.

Wu and Wei have a somewhat stronger case when they emphasize that Category XI(c)'s broad language and lack of technical parameters do not give "fair notice" to a "person of ordinary intelligence" that phase shifters are Munitions List-controlled. Cf. id. at 2317. After all, as the defendants note, phase shifters are small, technologically complex microchips; unlike the bomb and ammunition parts at issue in other cases,[7] the phase shifters may not have a self-evidently military purpose in the eyes of an ordinary person.

But Wu and Wei are not just ordinary people sending gifts to friends living overseas. They managed a multimillion-dollar enterprise; their company, Chitron, specifically pursued military customers; and Wu promoted himself as both an exporter of military supplies and an export compliance expert. The export of military equipment in particular is a "sensitive business" directed by "a relatively small group of sophisticated international businessmen." United States v. Lee, 183 F.3d 1029, 1032 (9th Cir.), cert. denied, 528 U.S. 990 (1999); see also United States v. Swarovski, 592 F.2d

---

[7]See, e.g., United States v. Sun, 278 F.3d 302, 308-09 (4th Cir. 2002) (tail-gun pods, underwater mines, missile fins, and assemblies for various weaponry); United States v. Murphy, 852 F.2d 1, 4 (1st Cir. 1988) (Redeye missile, M-16 rifles, submachine guns, and ammunition), cert. denied, 489 U.S. 1022 (1989).

131, 133 (2d Cir. 1979). It is not too much to ask these businessmen and businesswomen to comply with export control regulations, even if the meaning of those regulations might not be immediately obvious to someone lacking the same sophistication. Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982) (economic regulations are "subject to a less strict vagueness test because . . . businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action"). Furthermore, the ACEA's implementing regulations establish the commodity jurisdiction determination process in order to allow private parties to obtain an official government answer on whether an item is covered by the Munitions List before they engage in potentially unlawful conduct, see 22 C.F.R. § 120.4, a feature that further mitigates any concern about the law trapping an unwary dealer. See Vill. of Hoffman Estates, 455 U.S. at 498; see also Lachman, 387 F.3d at 57; Lee, 183 F.3d at 1032.[8]

Finally, the AECA's scienter requirement covers only "willful[]" violations of the law's export restrictions. 22 U.S.C. § 2778(c). The Act does not "impose criminal penalties on innocent

---

[8]While State Department guidance suggests that Wu and Wei would have needed a "letter of authorization" from M/A-Com in order to obtain a CJ determination, see U.S. State Dep't, Commodity Jurisdiction (CJ) FAQs, there is no reason to doubt that Wu and Wei could have satisfied that requirement if they had made any effort to do so.

or negligent errors." <u>United States</u> v. <u>Davis</u>, 583 F.2d 190, 193 (5th Cir. 1978). Where a statute "explicit[ly] provi[des] that a criminal violation of its terms must be 'willful,'" the void-for-vagueness doctrine is especially inapposite, <u>see</u> <u>United Union of Roofers, Waterproofers & Allied Workers</u> v. <u>Meese</u>, 823 F.2d 652, 659 (1st Cir. 1987) (Breyer, J.), since the statute itself ensures that "good-faith errors are not penalized," <u>Harris</u> v. <u>McRae</u>, 448 U.S. 297, 311 n.17 (1980). By criminalizing only willful violations of the law, the statute's scienter requirement "protects the innocent exporter who might accidentally and unknowingly export a proscribed component or part." <u>Lee</u>, 183 F.3d at 1032-33.

Outside the First Amendment context, we consider "whether a statute is vague as applied to <u>the particular facts at issue</u>," for a defendant "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." <u>Holder</u> v. <u>Humanitarian Law Project</u>, 130 S.Ct. 2705, 2719 (2010) (emphasis added) (internal quotation marks omitted). We need only determine whether the AECA and its regulations were vague "as applied to these particular defendants"--in other words, whether Wu and Wei "<u>in fact</u> had fair notice that the statute and regulations proscribed their conduct." <u>United States</u> v. <u>Hsu</u>, 364 F.3d 192, 196 (4th Cir. 2004). And as the district court concluded, there was ample evidence at trial

that Wu and Wei actually believed that the phase shifters required government licenses for export.

Before any of the exports at issue occurred, Chitron-US received a purchase order and later a price quotation from its supplier, Richardson Electronic; both documents warned Chitron specifically that the MAPCGM0003 phase shifter was subject to export control under the authority of the State Department, that exporting the item may require prior government approval, and that the phase shifter fell under Category XI of the Munitions List.

Chitron-US also received similar warnings in regard to the MAPCGM0002 phase shifter: first, from another supplier, Microwave Components, Inc., which sent Chitron a price quotation and later an invoice for the MAPCGM0002 phase shifters that included a disclaimer cautioning that exports may require prior authorization from the U.S. government and that it was the purchaser's sole responsibility to comply with U.S. export licensing requirements; and second, from Richardson Electronics, which sent Chitron a price quotation on the MAPCGM0002 phase shifters that included a warning that the part was subject to State Department export controls, that it may require prior government approval for export, and that it fell under Category XI of the Munitions List.[9]

---

[9] Wu and Wei raise several objections to this evidence. First, they contend that the "purchase order" on which the district court relied was in fact a "picking document" used internally by

The jury could infer that Wu and Wei were aware of these warnings. The two were "hands-on micro-managers," Wei supervised the Chitron-US office and was involved in the day-to-day purchasing, and Wei communicated daily with Wu via tasking lists-- all good reasons to attribute Chitron's knowledge to the defendants. Moreover, Wu and Wei repeatedly attempted to disguise the fact that they were exporting to China and that they lacked the necessary licenses to do so--further evidence that the defendants knew they were violating U.S. export regulations when they shipped the phase shifters to China without government permission. <u>See</u> <u>United States</u> v. <u>Sasso</u>, 695 F.3d 25, 29 (1st Cir. 2012); <u>United States</u> v. <u>Cranston</u>, 686 F.2d 56, 62 (1st Cir. 1982).

---

Richardson, to which Chitron would never have had access. However, testimony at trial indicated that the picking document was identical to the packing list Richardson included in the package for the buyer.

Second, Wu and Wei argue that the district court regarded the Richardson warnings as unreliable, and admitted them as business records only as to the question of "whether or not [the phase shifters] were bought and sold," but not as to the contents of the accompanying warnings that Chitron received. But in fact, the court admitted the picking document for the MAPCGM0003 phase shifter for all purposes, and admitted the testimony of Richard Catey, a Richardson employee, for the purpose of establishing the contents of the warnings that Chitron received.

Third, Wu and Wei claim that because the Richardson warnings only advised that the phase shifters "may" require prior government approval for export, the warnings fell short of constitutional notice requirements. However, the warnings specifically referenced the State Department's authority over the phase shifters and their presence on Munitions List Category XI. As a whole, the language of the warnings was sufficient to put Wu and Wei on notice and direct them to conduct a further inquiry as to the license requirements for exporting the phase shifters.

In sum, Wu and Wei cannot claim that they lacked "fair notice" of the Category XI(c) restrictions, and those restrictions are not so standardless as to allow for arbitrary enforcement. Accordingly, we hold that the Munitions List restrictions--as applied to Wu and Wei--are not void for vagueness. Accord Hsu, 364 F.3d at 196-98 (rejecting void-for-vagueness challenge to the Munitions List); Lee, 183 F.3d at 1031-33 (same); United States v. Gregg, 829 F.2d 1430, 1437 (8th Cir. 1987) (same), cert. denied, 486 U.S. 1022 (1988); Swarovski, 592 F.2d at 132-33 (same).

Jury Instructions. Wu and Wei are on much stronger footing when they challenge the district court's instruction to the jury that it must accept without question the State Department's after-the-fact determinations that the phase shifters were controlled by the Munitions List. Wu and Wei argue that by removing from the jury the question of whether the phase shifters fell under the Munitions List, the instructions violated their right to a jury finding on each essential element of the crime.

As an initial rejoinder, the government claims that since the AECA precludes judicial review of defense article designations, see 22 U.S.C. § 2778(h), the statute also bars jurors from deciding whether a particular item identified as a defense article in a CJ determination actually meets the criteria of the Munitions List. The Seventh Circuit previously rejected this argument, observing that § 2778(h) only covers designations made "in regulations," and

-23-

that a CJ determination by the Directorate is "not in a regulation." Pulungan, 569 F.3d at 328. However, the government urges us instead to follow the decision in Karn v. U.S Dep't of State, 925 F. Supp. 1 (D.D.C. 1996), remanded on other grounds, 107 F.3d 923 (table), 1997 WL 71750 (D.C. Cir. 1997) (per curiam) (unpublished opinion), which held that § 2778(h) does shield CJ determinations from judicial review. See id. at 5-6.

In this case, however, we need not decide the difficult questions of whether the provision's reference to "regulations" includes CJ determinations or certifications to courts, or whether the phrase "judicial review" applies to juries. Even if § 2778(h) does bar jury review of CJ determinations and/or certifications, there would be serious constitutional problems if we read that provision to render Directorate determinations issued after exports have already occurred as being retroactively dispositive as to the coverage of the Munitions List. Cf. Ashwander v. Tenn. Valley Auth., 297 U.S. 288, 346-48 (1936) (Brandeis, J., concurring). Our concern is not whether the form of the designations sufficed, but the timing: the government may not decide for itself that some prior act by a criminal defendant violated the law, and thereby remove that determination from the province of the jury.

As of June 2006, the time of the exports in question, no official determination had been made as to the presence of the phase shifters on the Munitions List. Indeed, at the time there

was disagreement even within the government as to the proper categorization of the phase shifters. The items apparently had some commercial utility, including in civilian aviation and cell phone technology. In February 2002, the Commerce Department issued Commodity Classifications concluding that the phase shifters were dual-use items covered by the Commerce Control List (which would indicate that they did not fall within the scope of Munitions List Category XI(c)). But in August 2003, the Defense Department's Tri-Services Committee verbally informed the manufacturer of the phase shifters that the items should be ITAR-controlled and thus under the authority of the State Department. This advice was never made public.[10]

It was not until December 2007, 18 months after Chitron exported the phase shifters in question, that the Directorate

---

[10]The fact that government officials disagreed about the proper classification of phase shifters does not mean that Category XI(c) is fatally vague. For instance, two police officers might disagree whether the barrel of a shotgun is greater or less than 18 inches, perhaps because they have different ideas about how length should be measured. See, e.g., United States v. Shaw, 670 F.3d 360, 365-66 (1st Cir. 2012) (discussing methods for measuring barrel length). But that does not mean the statutory provisions defining "firearm" by barrel length, 26 U.S.C. § 5845(a)(1)-(4), are void for vagueness. A statute can satisfy the Due Process Clause and still present occasional close calls.

Moreover, the fact that government officials disagreed about the proper classification of phase shifters does not defeat the mens rea element of the offense. Wu and Wei might well have believed that the phase shifters were Munitions List-restricted even while some government officials were doubtful. After all, the defendants were not privy to the State and Commerce Departments deliberations on the matter.

issued a CJ determination confirming that the MAPCGM0003 phase shifter fell within the coverage of the Munitions List. The Directorate never issued a CJ determination at all for the MAPCGM0002 phase shifter, but rather simply certified to the district court before trial, years after the export, that it was in fact covered by the Munitions List.

Nevertheless, at the conclusion of the trial, the district court, over the defendants' objections, instructed the jury that it should not consider "the appropriateness of the determinations made by the State Department" as to whether the phase shifters fell under the Munitions List. Instead, the court told the jury that it should only decide "whether the government has proved beyond a reasonable doubt that the Secretary of State determined that the charged parts were defense articles on the [Munitions List] at the time of export."

To see why this instruction improperly wrested a key question from the jury, we go back to first principles. "In the criminal law, both a culpable mens rea and a criminal actus reus are generally required for an offense to occur." United States v. Apfelbaum, 445 U.S. 115, 131 (1980); accord United States v. Vilches-Navarrete, 523 F.3d 1, 21 (1st Cir.) (Lynch, J., and Howard, J., opinion of the court in part and concurring in part), cert. denied, 555 U.S. 897 (2008). To use a straightforward and familiar example: the crime of possessing an unregistered firearm,

26 U.S.C. § 5861(d), requires (1) that the defendant possessed an unregistered weapon classified as a "firearm" under the National Firearms Act (the _actus reus_), and (2) that the defendant "knew of the features of his [weapon] that brought it within the scope of the Act" (the _mens rea_). _Staples_ v. _United States_, 511 U.S. 600, 619 (1994).

In the ordinary course, the _actus reus_ element will be easier to prove than the _mens rea_. The National Firearms Act says that a shotgun having a barrel of less than 18 inches must be registered, _see_ 26 U.S.C. § 5845(a), and barrel length may be readily measured. Thus, in _United States_ v. _Shaw_, 670 F.3d 360 (1st Cir. 2012), it was uncontested that the barrel of the defendant's shotgun measured only sixteen and a quarter inches; the issue in dispute was whether the defendant _knew_ that the barrel was shorter than the requisite length. _Compare_ _id._ at 364 (majority opinion), _and_ _id._ at 368-69 (Boudin, J., concurring), _with_ _id._ at 376 (Lipez, J., dissenting).

But even where the evidence is sufficient to show the necessary _mens rea_, the government still must always "meet its burden of proving the _actus reus_ of the offense." _United States_ v. _Whiteside_, 285 F.3d 1345, 1353 (11th Cir. 2002). For instance, if a defendant mistakenly thinks that the barrel of his unregistered shotgun is shorter than eighteen inches when in fact it is longer than that length, he is innocent of the crime of possessing an

unregistered firearm, even though he had the requisite guilty mind. Cf. United States v. De La Torre, 599 F.3d 1198, 1204 (10th Cir. 2010) (government must "prove[] the defendant had the requisite guilty mind" and "prove the defendant did possess the particular controlled substance charged in the indictment"), cert. denied, 131 S. Ct. 227 (2010).

Here, to convict the defendants of violating the AECA, 22 U.S.C. § 2778(c), the jury had to find not only that the defendants acted with the requisite mens rea (willfulness), but also that they actually committed the actus reus charged (violation of regulations issued under the statute). Put differently, even if the jury found that Wu and Wei believed that phase shifters fell within the Munitions List restrictions, it would still have to conclude that the phase shifters actually did fall within the Munitions List restrictions (regardless of Wu and Wei's beliefs). And as to whether Wu and Wei violated regulations issued under the AECA, the proper question for the jury was whether Wu and Wei's conduct violated the relevant regulations as those regulations existed at the time the conduct occurred. See Lindsey v. Washington, 301 U.S. 397, 401 (1937) ("The Constitution forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer.").

In defense of the jury instructions, the government argues that the question of whether the phase shifters fall within

the Munitions List is a legal issue not suited for jury determination. Cf. Sparf v. United States, 156 U.S. 51, 106-07 (1895) (juries decide factual questions, not legal questions). In support, it cites to our cases construing the felon-in-possession statute, in which certain issues of law embedded in the definition of "prior conviction" (such as whether a former felon's right to carry a firearm has been restored) are denied to the jury. See, e.g., United States v. Bartelho, 71 F.3d 436, 440 (1st Cir. 1995). Yet in Bartelho, we held that "a showing that the [defendant's] right to carry a firearm has not been restored is not an element of a [felon-in-possession statute] violation." Id. at 439. By contrast, we have held that a showing that an exported item was on the Munitions List is an element of a § 2778 violation. See United States v. Murphy, 852 F.2d 1, 6 (1st Cir. 1988). And in order to convict a defendant under a criminal statute, the government must prove each element of the offense to a jury beyond a reasonable doubt. See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); see also S. Union Co. v. United States, 132 S. Ct. 2344, 2350 (2012).

This is not to deny that "Congress enjoys latitude in determining what facts constitute elements of a crime which must be tried before a jury and proved beyond a reasonable doubt and which do not." Vilches-Navarrete, 523 F.3d at 20 (Lynch, J., and Howard, J.). But Congress has never said that a criminal defendant may be

convicted on the basis of an <u>ex post</u> determination by a State Department official outside the regulatory process.

The government also invokes <u>United States</u> v. <u>Spawr Optical Research, Inc.</u>, 864 F.2d 1467 (9th Cir. 1988), <u>cert. denied</u>, 493 U.S. 809 (1989), and <u>United States</u> v. <u>Hammoud</u>, 381 F.3d 316 (4th Cir. 2004) (en banc), <u>vacated on other grounds</u>, 543 U.S. 1097 (2005), both involving government designations that juries were required to accept. But crucially, in both cases the government designations at issue were made <u>before</u> the defendants' allegedly unlawful conduct occurred. <u>See</u> <u>Hammoud</u>, 381 F.3d at 331; <u>Spawr Optical Research, Inc.</u>, 864 F.2d at 1468-69. To determine whether the defendants committed the charged <u>actus reus</u> by violating the laws as they existed at the time, the trial courts simply had to determine whether the prior designations had actually been made. <u>See</u> <u>Spawr Optical Research, Inc.</u>, 864 F.2d at 1473; <u>Hammoud</u>, 381 F.3d at 331. In this case, no State Department designation had been made at the time that the defendants engaged in the charged conduct.

Perhaps it would have been possible for the prosecution to persuade the jury--beyond a reasonable doubt--that the phase shifters really did fall within the Munitions List restrictions as those restrictions stood at the time of the defendants' exports. For instance, the prosecution could have presented evidence that the phase shifters were designed for use with other Category XI

-30-

equipment and that they were not in normal commercial use. 22 C.F.R. § 121.1(c)(XI)(c). Here, we only go so far as to say that under the existing statutory and regulatory scheme, the question of whether phase shifters were items controlled by Category XI(c) of the Munitions List was a question for the jury--not a question that could be decided ex post by the State Department as a matter of law.

We acknowledge that instructional error is not necessarily grounds for reversal, even when the error amounts to the complete omission of an element of the charged offense. As the Supreme Court has held, "where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." Neder v. United States, 527 U.S. 1, 17 (1999); see also United States v. Gerhard, 615 F.3d 7, 29 (1st Cir. 2010). But here, the defendants did contest the prosecution's claim that the phase shifters fell within Category XI(c) of the Munitions List at the time of the export, thus making this case different from Neder. In any event, given the dissension between the State and Commerce Departments on this very matter, we cannot "conclude[] beyond a reasonable doubt . . . that the jury verdict would have been the same absent the error." Cf. Neder, 527 U.S. at 17.

We also acknowledge that our holding means that in at least some cases involving Category XI(c) of the Munitions List, the question of whether a particular part fell within Category XI(c) of the Munitions List at the time of the alleged export will be a question for the jury. This is not out of the ordinary. Juries are "commonly called upon to decide complex cases." Green Constr. Co. v. Kan. Power & Light Co., 1 F.3d 1005, 1011 (10th Cir. 1993). These include highly technical patent and tax cases as well as cases concerning terrorism and espionage. So too, juries are capable of determining whether phase shifters are specifically designed for military use with the items listed in Munitions List Categories XI(a) and (b) and whether they are exempt from the restrictions due to "normal commercial use." Although permitting juries to decide questions like these may complicate enforcement of our nation's export control regime, the constitutional rights at issue--the guarantee of due process of law, the right to a jury trial, the protection against ex post facto laws--are of "surpassing importance." Apprendi, 530 U.S. at 476.[11]

---

[11]In any event, as defense counsel noted at oral argument, it appears that these complications may be largely avoided through the State Department's own recently proposed amendment to Category XI of the Munitions List, which would revise that provision, especially subsection XI(c), to include a "positive list" of specific controlled items in place of its current catalogue of generic descriptions. See Amendment to the International Traffic in Arms Regulations: Revision of U.S. Munitions List Category XI and Definition for "Equipment," 77 Fed. Reg. 70,958 (proposed Nov. 28, 2012) (to be codified at 22 C.F.R. pt. 121). The proposed revision of Category XI(c) appears to include phase shifters

Our decision to vacate the Munitions List convictions only affects two of the seventeen counts on which Wu was convicted and two of the thirteen counts on which Wei was convicted.[12]

B.  Commerce Control List (CCL) Counts

On the Commerce Control List ("CCL") counts, Wu and Wei were convicted on charges that they exported dual-use electronic components to China repeatedly between May 2004 and May 2007.  As with the Munitions List counts, Wu and Wei challenge the jury instructions, although they also argue that their conduct was perfectly legal under the relevant regulations and that there was insufficient evidence for the jury to conclude otherwise.

Statutory and Regulatory Framework.  The International Emergency Economic Powers Act ("IEEPA") imposes criminal penalties

---

specifically within its ambit, see id. at 70,963, and so, if finalized, it would permit the government to prosecute future exporters without proving anew each time that phase shifters are within the scope of the Munitions List.

[12]Because we vacate the Munitions List convictions on the grounds that the district court's charge improperly wrested the actus reus question from the jury, we do not reach the defendants' argument that the jury instructions with respect to the mens rea element were fatally flawed.  According to the district court's instructions, the jury could find that the mens rea element of the Munitions List counts had been met if "the defendants willfully made themselves blind to th[e] fact" that phase shifters were defense articles on the Munitions List.  Wu and Wei argue that allowing them to be convicted on the basis of "willful blindness" improperly lowered the mens rea requirement in § 2778(c).  See generally United States v. Roth, 628 F.3d 827, 834 (6th Cir. 2011) (noting that "circuits have interpreted the willfulness element of section 2778(c) and produced different results," and compiling cases), cert. denied, 132 S. Ct. 94 (2011).

on any person who "willfully commits . . . or willfully conspires to commit" a violation of regulations issued under the Act. 50 U.S.C. § 1705(c). The IEEPA's penalty provision applies to violations of the Export Administration Regulations (EAR), 15 C.F.R. pts. 730-774. See generally United States v. Zhi Yong Guo, 634 F.3d 1119, 1121-22 (9th Cir.), cert. denied, 131 S. Ct. 3041 (2011). Five provisions of the EAR are especially relevant to this case.

First, the CCL describes items that are subject to the EAR and assigns Export Classification Control Numbers (ECCNs) to various categories of commodities, software, and technology. See 15 C.F.R. § 774.1 & Supp. No. 1. The CCL covers "dual use" items, i.e., items that have commercial as well as military applications. See id. § 730.3; Micei Int'l v. Dep't of Commerce, 613 F.3d 1147, 1150 (D.C. Cir. 2010).

Second, the Commerce Country Chart, 15 C.F.R. pt. 738 Supp. No. 1, assigns countries to various categories based on the risk that exports to those countries will pose a threat to U.S. national security or other vital interests. Even though Hong Kong has been a special administrative region of the People's Republic of China since 1997, Hong Kong and China are categorized differently for EAR purposes. Hong Kong is subject to "NS Column 1" controls (as is every other country except Canada), while China is subject to "NS Column 1" and "NS Column 2" controls.

-34-

Third, the EAR's "General Prohibition One," id. §
736.2(b)(1), prohibits the export and reexport of controlled items
to certain countries without a license or license exception. The
application of General Prohibition One depends on the Export
Classification Control Number of the item in question and the
Commerce Country Chart category of the country of destination. For
example, electronic components in the ECCN 3A001 category cannot be
exported or reexported to "NS Column 2" countries without a license
or license exception (although they may, in general, be exported or
reexported to "NS Column 1" destinations).

Fourth, a section titled "Important EAR terms and
principles," id. § 734.2, defines the words "export" and "reexport"
for purposes of the regulations. Most importantly, the so-called
"deemed export" provision in that section states that:

> For purposes of the EAR, the export or
> reexport of items subject to the EAR that will
> transit through a country or countries or be
> transshipped in a country or countries to a
> new country or are intended for reexport to
> the new country, are deemed to be exports to
> the new country.

Id. § 734.2(b)(6).

Fifth, and finally, a section titled "Additional
permissive reexports (APR)," id. § 740.16, allows unlicensed
reexports of certain items from "cooperating countries" (a category
that includes Hong Kong) to destinations in "Country Group D:1" (a

category that includes China).  Id. § 740.16(a); see also id. pt. 740 Supp. No. 1.

The items at issue here are digital-to-analog and analog-to-digital converters.  While such converters are used in ordinary audio and video players and cell phones, Wu and Wei allegedly exported converters that were rated for operation over an ambient temperature range of minus 55 degrees Celsius (minus 67 degrees Fahrenheit) to 125 degrees Celsius (257 degrees Fahrenheit)--specifications more consistent with military systems than with household electronic appliances.

CCL Jury Instructions.  Wu and Wei's first argument for vacating the CCL convictions is similar to the challenge that they raise to the Munitions List counts:  an ex post facto determination by a government official that the items at issue fall within the relevant export control category cannot substitute for a jury finding that, at the time of export, the items were subject to license requirements.  However, the concerns about ex post facto lawmaking that control our analysis of the Munitions List counts do not lead to the same conclusion here.

By the time of the first converter shipment charged in the indictment (May 8, 2004), analog-to-digital and digital-to-analog converters rated for operation in the ambient temperature range of -55 degrees Celsius to 125 degrees Celsius were already listed on the CCL and assigned an Export Classification Control

Number of 3A001, meaning that they were subject to NS Column 2 controls and could not be exported to China without a license. See 15 C.F.R. pt. 774 Supp. No. 1 (2003); Implementation of the Wassenaar Arrangement List of Dual-Use Items, 65 Fed. Reg. 43,130, 43,135 (July 12, 2000).  The items allegedly exported on May 8, 2004--sixty Intersil digital-to-analog converters with part number CA3338AD--clearly fall within the scope of the Commerce Control List's ECCN 3A001 category; one can ascertain as much by comparing the ordering information provided by the manufacturer with the relevant regulation. Compare Intersil Corp., CA3338, CA3338A (File No. 1850.2), at 10-11 (Aug. 1997) (stating that the temperature range for part number CA3338AD is -55 degrees Celsius to 125 degrees Celsius), with 15 C.F.R. pt. 774 Supp. No. 1.

At trial, an expert witness from the Commerce Department walked the jury through the steps involved in determining whether a particular part requires a license for export under the CCL, and the government presented a chart summarizing the results of the expert's analysis with respect to other charged parts.  Cf. Fed. R. Evid. 1006 (admissibility of summary or chart to prove content of voluminous records).  Wu and Wei give us no cause to doubt any of these determinations.

Here, the district judge properly instructed the jury that to meet its burden with respect to the CCL counts, the government had to prove beyond a reasonable doubt "that the charged

item was classified with an Export Control Classification Number
3A001 of the Commerce Control List at the time it was exported."
But the district judge followed this up by saying:

> You should not consider the appropriateness of
> the determinations made by the Department of
> Commerce.  <u>You may only consider whether the
> government has proven beyond a reasonable
> doubt that the Secretary of Commerce
> determined that the charged parts fell within
> the ECCN of the Commerce Control List.</u>

Wu and Wei argue that the last sentence of the above-
quoted instruction improperly wrested a question of fact from the
jury under the circumstances of the case.  If the underscored
sentence referred to the Commerce Department's <u>ex post</u>
determination--issued as part of the Chitron investigation--that
the charged parts fell within ECCN 3A001, then we would agree.  An
<u>ex post</u> determination does not substitute for a finding from the
trier of fact that <u>at the time of the alleged exports</u>--based on
<u>then-existing regulations</u>--the charged parts fell within the
relevant CCL category.

But that does not resolve the matter.  As we have noted,
the harmless error standard applies to instructional errors, <u>see
Neder</u>, 527 U.S. at 17, and here, Wu and Wei have not explained how
they were prejudiced by the instructional error.  It is uncontested
that the items described in the indictment carried specifications
that placed them squarely within the ECCN 3A001 category.  Wei's
appellate brief says that "whether these parts were controlled by

-38-

the CCL was a contested issue," but the record appendix page numbers cited do not support this claim. Wu and Wei do not argue, for example, that the charged items were not analog/digital converters or that the converters were incapable of operating over the ambient temperature ranges for which they were rated. So although the question of whether the items at issue fell within ECCN 3A001 at the time of the alleged export should have been submitted to the jury, we are confident that a properly instructed jury would have answered that question in the affirmative. Accordingly, under <u>Neder</u>, we conclude that the error was harmless.

   <u>Rejection of Defense of Additional Permissive Reexport</u> <u>(APR) Exception.</u> Wu and Wei also argue that as they read the license exception for additional permissive reexports (APRs), no license was required when the controlled converters were exported to Hong Kong and then reexported to China. We dispose of this argument rather easily, as the argument is based on a misreading of the APR provision. That provision only applies to "<u>[r]eexports</u>" from nations in Country Group A:1 and "cooperating countries." 15 C.F.R. § 740.16(a) (emphasis added). (Hong Kong is a "cooperating country." <u>Id.</u> pt. 740 Supp. No. 1.) At most, the APR provision exempts Hong Kong-based merchants from U.S. licensing requirements when they import items from the United States and reexport those items to China. But Chitron-US was not a reexporter; it was an exporter. And the APR provision simply does not speak to the

question of whether an exporter needs a license when it ships listed items abroad.

The Commerce Department first promulgated the APR provision as part of an effort "to simplify, clarify, and make the [Export Administration Regulations] more user-friendly." Simplification of Export Administration Regulations, 61 Fed. Reg. 12,714 (Mar. 25, 1996). One can see how the APR exception might advance this objective. For instance, in the case of items that fall within ECCN 3A001, the exporter already must obtain a license before shipping such items to a freight-forwarder or other middleman in an "NS Column 1" country (e.g., Hong Kong) when the items are "intended for reexport" to an "NS Column 2" country (e.g., China). See 15 C.F.R. § 734.2(b)(6). Under such circumstances, it would be duplicative to require that the freight-forwarder or reexporter in the "NS Column 1" country also apply for an additional license before proceeding with the contemplated transaction.

But although the APR provision provides a license exception for the overseas freight-forwarder or reexporter, it does not relieve the U.S.-based exporter of the burden of complying with the EAR. If it did, then the APR provision would allow exporters to evade EAR requirements by routing shipments through countries subject to looser controls. Cf. Lachman, 387 F.3d at 52 (rejecting defendant's proposed interpretation of export controls

-40-

where it "would permit easy evasion of the regulation").  By their
very terms, the deemed-export provision and the APR license
exception address different classes of merchants:  the former is
directed to those such as Chitron-US who export controlled items
from the United States with the intention that the items will be
reexported to a particular prohibited destination, while the latter
grants relief to overseas merchants who may sometimes deal in parts
of U.S. origin.[13]

Sufficiency of the Evidence.  In the alternative, Wu and
Wei argue that even if a license was required for the shipment of
controlled converters to China via Hong Kong, the evidence
presented at trial was insufficient to show that the converters
actually reached China.  Our review is de novo, viewing the

_____

[13]In a futile attempt to complicate matters, the defendants
draw our attention to a separate subsection of the APR, 15 C.F.R.
§ 740.16(i), which applies only to Sudan.  That subsection allows
for reexports of certain controlled items to Sudan but adds a
clarification:  "However, the export from the United States to any
destination with knowledge that [the controlled items] will be
reexported directly or indirectly, in whole or in part to Sudan is
prohibited without a license."  The defendants claim that the
clarification would be superfluous unless the APR already allowed
the export of controlled items from the United States with the
knowledge that those items would be reexported to a listed country.
But the fact that the drafters of the APR included an extra
clarification in the Sudan subsection does not alter the plain
meaning of the rest of the APR's text.  Where drafters include a
clarification "as a means of reminding those subject to the new
laws of . . . self-operative, previously enacted sanctions," the
clarification "necessarily establish[es] no more than that [the
drafters] chose in some cases to make assurance doubly sure."
United States v. Hansen, 772 F.2d 940, 946-47 (D.C. Cir. 1985)
(Scalia, J.), cert. denied, 475 U.S. 1045 (1986).

evidence "in the light most favorable to the verdict" and reversing "only where no rational factfinder could have concluded that the evidence presented at trial, together with all reasonable inferences, established [this] element of the crime beyond a reasonable doubt." United States v. Green, 698 F.3d 48, 56 (1st Cir. 2012) (internal quotation mark omitted), cert. denied, 2013 U.S. LEXIS 1942 (Mar. 4, 2013).

Here, there was ample evidence to support the jury's finding. Specifically:

> -Sales spreadsheets in Wu's possession at the time of his arrest indicated that the converters in question were destined for customers whose listed addresses were in China;
>
> -Three Chitron-US employees testified that once parts reached Hong Kong, they were forwarded to a Chitron office in Shenzen, China;
>
> -Chitron-US brochures said that the company's "sole distributor" was based in Shenzen;
>
> -Wu said on his resume that as President of Chitron Electronics, he "[s]upervised and coordinated business with Chitron USA to import all its purchased goods into China" (emphasis added); and
>
> -Wei acknowledged at trial that a document she last saved on her computer in October 2006 said that "Chitron's customer base is 99 percent Mainland Chinese customers."

A sufficiency-of-the-evidence challenge will fail even when the evidence does "not exclude every reasonable hypothesis of innocence"; if the evidence "can support varying reasonable

-42-

interpretations, the jury is entitled to choose among them." United States v. Quejada-Zurique, 708 F.2d 857, 859 (1st Cir.), cert. denied, 464 U.S. 855 (1983). Here, there is scant support for Wu and Wei's hypothesis of innocence. It was certainly "reasonable" for the jury to conclude that the controlled converters reached China (and might well have been unreasonable for the jury to conclude otherwise). And the fact that the government's case relied largely on circumstantial evidence does not detract from its persuasive force. See United States v. Cortés-Cabán, 691 F.3d 1, 12 (1st Cir. 2012).

C. Conspiracy Count

While Wu and Wei were charged with one count of conspiracy, that one count covered both conspiracy to export defense articles on the Munitions List and conspiracy to export commodities on the Commerce Control List. Wu and Wei argue that the district court's erroneous instructions regarding the Munitions List counts "infected" the conspiracy count. We disagree.

It is black letter law that a defendant can be convicted of conspiracy to commit a substantive offense even if he is acquitted of the substantive offense itself. United States v. Ríos-Ortiz, No. 11-2200, ___ F.3d ___, 2013 U.S. App. LEXIS 4068, at *15 (1st Cir. Feb. 27, 2013) (compiling cases). For example, a defendant can be convicted of conspiracy to steal a trade secret even if the documents he sought to steal did not in fact contain

-43-

trade secrets.  United States v. Yang, 281 F.3d 534, 542-43 (6th Cir. 2002), cert. denied, 537 U.S. 1170 (2003); United States v. Hsu, 155 F.3d 189, 203-04 (3d Cir. 1998).  Similarly, a defendant can be convicted of conspiracy to distribute cocaine and narcotics even though, unbeknownst to him, the substances he was distributing turned out to be innocuous.  United States v. Pietri, 683 F.2d 877, 879-80 (5th Cir. 1982); see also United States v. Roman, 728 F.2d 846, 859 (7th Cir. 1984) ("To establish conspiracy [to distribute L.S.D.] the items believed to be L.S.D. need not in fact be L.S.D."), cert. denied, 466 U.S. 977 (1984); United States v. Murray, 527 F.2d 401, 408-09 (5th Cir. 1976) (conspiracy to distribute heroin even though substance turned out to be lactose).  "[T]he impossibility that the defendants' conduct would result in consummation of the contemplated substantive crime is not persuasive or controlling."  United States v. Meyers, 529 F.2d 1033, 1037 (7th Cir.), cert. denied, 429 U.S. 894 (1976).  See generally United States v. Fiander, 547 F.3d 1036, 1042-43 (9th Cir. 2008) (compiling cases).

Just as a defendant can be convicted of conspiracy to steal trade secrets even when the information he conspires to steal is not in fact a trade secret, and just as a defendant can be convicted of conspiracy to distribute narcotics even when the substance he conspires to distribute is not in fact a narcotic, so too can a defendant be convicted of conspiracy to export items on

the Munitions List even when the items he conspires to export are not in fact on the Munitions List. Thus, whether the phase shifters that Wu and Wei exported to China were actually on the Munitions List was not essential to the conspiracy charge. The fact that the district court wrested this question from the jury does not undermine the conspiracy count, because this question was never part of the conspiracy inquiry anyway.

Wu and Wei also renew their argument that the district court improperly instructed the jury that the mens rea element of the Munitions List counts required only a finding of "willful blindness," and they claim that this instructional error likewise infected the conspiracy charge. As noted above, we do not reach the question of whether the mens rea requirement of willfulness in 22 U.S.C. § 2778(c) encompasses "willful blindness," as we vacate that the Munitions List convictions on other grounds. See supra note 12. With regard to the conspiracy count, the district court instructed the jury that willfulness was an element of the crime and that "[t]o act 'willfully means to act voluntarily and intelligently with the specific intent that the underlying crime be committed." The court added that Wu and Wei could not be convicted on the conspiracy count if they "act[ed] by ignorance, accident, or mistake." The district court did _not_ instruct the jury that it could convict Wu and Wei of conspiracy on a "willful blindness" theory. Thus, the propriety of the "willful blindness" instruction

-45-

in the context of the Munitions List counts has no bearing on the
validity of the conspiracy conviction.

III.

In addition to their convictions on the Munitions List
and CCL counts and the related conspiracy count, Wu and Wei were
convicted of conspiracy to file false and misleading Shipper's
Export Declarations; they were likewise convicted of violating 18
U.S.C. §§ 2 and 1001(a)(1) in connection with the inaccurate SEDs.
See 18 U.S.C. § 2 (criminal liability for aiding and abetting
offense against the United States); id. § 1001(a)(1) (criminal
liability for falsifying, concealing or covering up a material fact
in a matter within the federal government's jurisdiction).  Wu and
Wei argue that the evidence supporting those convictions was
legally insufficient and that the jury instructions on those counts
were erroneous.  These arguments fail.

Statutory and Regulatory Framework.  Acting within its
authority under 13 U.S.C. § 301 (authorization to collect
information from exporters and importers), the Commerce Department
has promulgated the Foreign Trade Regulations, 15 C.F.R. pt. 30,
which, inter alia, require exporters to file "Shipper's Export
Declarations" electronically for all goods being sent to foreign
countries.  See 15 C.F.R. § 30.2(1).  Although certain shipments
are exempt from the SED requirement when the aggregate value of the
items is $2,500 or less, see id. § 30.37(a), SEDs still must be

-46-

filed for goods requiring an export license regardless of value, id. § 30.2(a)(1)(iv).

The SED form instructs exporters to specify the "ultimate consignee" and the "country of ultimate destination" for the items being shipped. The governing regulations distinguish the "ultimate consignee" from the "intermediate consignee": the ultimate consignee is either the "end user" or the party "to whom final delivery . . . of the goods will be made," while the intermediate consignee is the agent who acts "with the purpose of effecting delivery of items to the ultimate consignee." Id. § 30.1. The country of ultimate destination is the "country where the goods are to be consumed, further processed, stored, or manufactured, as known to the [U.S. principal party in interest] at the time of export." Id. The U.S. principal party in interest is the "person or legal entity in the United States that receives the primary benefit . . . from the export transaction." Id.

Challenges to the SED Counts. The defendants do not seriously dispute that Chitron-US filed false SEDs: Wei listed Hong Kong-based freight forwarders as the ultimate consignees on some forms and listed Chitron's Hong Kong office as the ultimate consignee on other such forms, when in fact the ultimate consignees were the purchasers in mainland China. Moreover, Wei incorrectly listed Hong Kong--rather than China--as the country of ultimate destination. The regulations regarding SEDs are quite clear as to

-47-

the meaning of the relevant terms, and the <u>ex post facto</u> concerns governing our analysis of the Munitions List counts are inapposite here, as these rules were in place for more than a quarter century before the shipments in question. <u>See</u> 41 Fed. Reg. 9134 (Mar. 3, 1976) (republication of 15 C.F.R. pt. 30).

Rather, the defendants argue that (1) the government failed to prove that there was an <u>agreement</u> between Wu and Wei to file false SEDs, (2) the government failed to prove that Wei <u>knew</u> the SEDs were incorrect, and (3) the jury instructions regarding the SED counts improperly incorporated different definitions of key terms than the definitions on which Wei relied. We consider (and reject) each of these arguments in turn.

<u>Proof of Agreement.</u> "The touchstone of conspiracy is an agreement to do an unlawful act," <u>United States</u> v. <u>Martinez-Medina</u>, 279 F.3d 105, 113 (1st Cir.), <u>cert. denied</u>, 537 U.S. 921 (2002), and the government's failure to produce evidence sufficient to show such an agreement would be grounds for reversal. <u>See, e.g.</u>, <u>United States</u> v. <u>Paret-Ruiz</u>, 567 F.3d 1, 8 (1st Cir. 2009). But "[a]n agreement between coconspirators may be proven by circumstantial evidence, and it may be tacit." <u>Id.</u> at 6. Here, a reasonable jury could certainly have concluded that Wu and Wei agreed--at least tacitly--to file false SEDs.

The evidence supporting the conspiracy charge included:

-An e-mail from Wu to Wei in which Wu said, "you do not have to say you sell parts to China";

-Instructions from Wu to purchasers in Chitron-US's Massachusetts office in which Wu wrote that "[t]he key is to avoid submitting end user info"; and

-An e-mail from Wei to Wu in which she described complications in filling out an SED form and then wrote, "In order not to waste too much time, I have to reduce the value under 2500 to make it simple."

Since exporters do not need to file SEDs for certain shipments of items worth $2,500 or less, see 15 C.F.R. § 30.37(a), this last piece of evidence supports the inference that Wei was trying to circumvent SED requirements--and that she was doing so with Wu's tacit consent. "Proof of [a defendant's] involvement in the conspiracy may consist of indirect evidence, including reasonable inferences drawn from attendant circumstances." United States v. Medina-Martinez, 396 F.3d 1, 5 (1st Cir.) (internal quotation marks omitted), cert. denied, 544 U.S. 1007 (2005). Here, the attendant circumstances included the fact that Wu and Wei communicated daily about all aspects of Chitron's operations, along with their obvious motive (in light of the Munitions List and Commerce Control List rules) to misrepresent the ultimate destination as Hong Kong. On this basis, a "rational trier of fact" certainly could have found Wu and Wei guilty of the conspiracy charged. See United States v. Alverio-Meléndez, 640 F.3d 412, 418 (1st Cir.), cert. denied, 132 S. Ct. 356 (2011).

Proof of Knowledge.  For a false statement to trigger
criminal liability under 18 U.S.C. § 1001, "the false statement
must be made knowingly and willfully." United States v. Gonsalves,
435 F.3d 64, 72 (1st Cir. 2006); see also United States v. Yermian,
468 U.S. 63, 72-74 (1984).  "Willfulness . . . means nothing more
in this context than that the defendant knew that his statement was
false when he made it or--which amounts in law to the same
thing--consciously disregarded or averted his eyes from its likely
falsity."  Gonsalves, 435 F.3d at 72.

Wei testified at trial that she thought that the term
"ultimate consignee" meant "the person or the company who received
the package" and that the term "country of ultimate destination"
meant "the country where the package will land."  She now argues
that she arrived at this understanding based on a Census Bureau
document entitled "Correct Way to Complete the Shipper's Export
Declaration," which she received by fax from a UPS employee in
2002.  But the Census Bureau document defines "ultimate consignee"
as "the foreign party actually receiving the merchandise for the
designated end-use or the party so designated on the export
license."[14]  A jury could easily reject Wei's claim that she thought
the freight forwarder or the Chitron branch office in Hong Kong was
the party "receiving the merchandise for the designated end use,"

---

[14]Since Chitron-US had no export license, the last clause in
the definition of "ultimate consignee" is irrelevant here.

especially when Wei knew that Chitron's customers were primarily in mainland China. The jury was under no obligation to credit Wei's testimony. See United States v. Kenrick, 221 F.3d 19, 31 n.14 (1st Cir.) (en banc), cert. denied, 531 U.S. 961 (2000).

In any event, a former Chitron-US employee testified that prior to the filing of the false SEDs at issue, she spoke on the telephone with a Commerce Department official who explained that the "ultimate consignee" is "the end-user who is using the part where it's ultimately going, and it's not being shipped to anywhere else." The employee further testified that she relayed this information to Wei. So even if Wei had misinterpreted the SED requirements in the first instance, the jury could conclude that her misimpression had been corrected by her employee.

Jury Instructions. Finally, Wu and Wei argue that the jury instructions improperly incorporated language from the Code of Federal Regulations defining the terms "ultimate consignee" and "country of ultimate destination" when the instructions should have been limited to the definitions in the Census Bureau document on which Wei allegedly relied. In so arguing, Wu and Wei confuse the actus reus and mens rea elements of the relevant crime.

To convict the defendants under the false statements statute, the jury had to find (1) that the defendants' answers on the SED form "falsifie[d], conceal[ed], or cover[ed] up . . . a material fact" (the actus reus) and (2) that the defendants did so

-51-

"knowingly and willfully" (the <u>mens rea</u>). <u>See</u> 18 U.S.C. § 1001(a).

The <u>actus reus</u> requirement means that the answers Wei gave on the

SED form to the questions about "ultimate consignee" and "country

of ultimate destination" must have been false or misleading,

regardless of what she and Wu believed. Even if the defendants

<u>thought</u> that they had misstated the ultimate consignee or country

of ultimate destination on the SED forms (i.e., even if the

defendants acted with the requisite <u>mens rea</u>),[15] the jury still

needed to find that they actually <u>did</u> misstate these material

facts. And to find that, the jury needed to consult the

definitions of "ultimate consignee" and "country of ultimate

destination" <u>under law</u> (i.e., in the Code of Federal Regulations).

For that purpose, the plain language of the regulation--and not the

guidance document--is controlling. <u>See</u> <u>Nat'l Family Planning &</u>

<u>Reprod. Health Ass'n</u> v. <u>Sullivan</u>, 979 F.2d 227, 235-36 (D.C. Cir.

1992).

---

[15]Of course, the definitions in the Census Bureau document may
be relevant to <u>mens rea</u>: if the jury found that Wu and Wei
genuinely believed on the basis of the guidance document that their
answers on the SED form were correct, then the requirement that
they must have acted "knowingly and willfully" would not be
satisfied. But the defendants do not object to the <u>mens rea</u>
portion of the jury instructions on the SED counts. Nor could
they, as the instructions emphasized that the <u>mens rea</u> element
required the defendants to have acted "purposely and
voluntarily, . . . with an intention to do something that the law
forbids . . . or with the specific intent to fail to do something
that the law requires to be done."

In a last-ditch effort, Wei argues in her reply brief
that the jury instructions improperly incorporated language from
the Export Administration Regulations defining "end-user," while it
is the Foreign Trade Regulations--not the EAR--that control the
construction of terms on the SED form.  See 15 C.F.R. § 772.1
(stating that the "end-user" for the purposes of the EAR is "not a
forwarding agent or intermediary").  "[A]ppellate arguments debuted
in a reply brief are not preserved," Soto-Padró v. Pub. Bldgs.
Auth., 675 F.3d 1, 8 (1st Cir. 2012), and that alone would be fatal
to Wei's claim.  But even if the argument were not waived, it would
not succeed:  while the exact words used by the district judge in
her instructions did come from the EAR, the substance of the
Foreign Trade Regulations is nearly identical.  See 15 C.F.R. §
30.1 (ultimate consignee may be the end user or the foreign
principal party in interest, and "[i]n most cases, the forwarding
or other agent is not a principal party in interest").

Admittedly, the Foreign Trade Regulations say that a
forwarding agent is not the ultimate consignee in "most cases,"
while the jury instructions implied that a forwarding agent is
never the ultimate consignee.  But that distinction makes no
difference to this case.  Under the Foreign Trade Regulations, a
forwarding agent would only be the ultimate consignee if the
forwarding agent was the foreign person who "receive[d] the primary
benefit, monetary or otherwise, from the transaction," 15 C.F.R. §

-53-

30.1, and neither Wei nor Wu argues that the Hong Kong-based
freight forwarders or the Chitron office located there "receive[d]
the primary benefit" from any of the transactions in question.

IV.

Wei separately challenges the sufficiency of the evidence
supporting her conviction on one count of immigration fraud in
connection with her September 2002 application for a U.S. Permanent
Resident Card ("Green Card").  See 18 U.S.C. § 1546(a).  The
indictment set forth two distinct theories in support of this
count.  First, it charged that Wei's Green Card application
concealed her earlier work for Chitron-US's predecessor entity,
Perfect Science, to cover up the fact that she had violated U.S.
immigration laws by working there between 1996 and 1998.  Second,
it claimed that Wei lied on her application when she answered that
she did not "intend to engage in the U.S. in any activity to
violate or evade any law prohibiting the export from the United
States of goods, technology, or sensitive information."

"The general rule is that when a jury returns a guilty
verdict on an indictment charging several acts in the
conjunctive . . . , the verdict stands if the evidence is
sufficient with respect to any one of the acts charged."  Turner v.
United States, 396 U.S. 398, 420 (1970); accord United States v.
Mubayyid, 658 F.3d 35, 70 (1st Cir. 2011), cert. denied, 132 S. Ct.
2378 (2012).  However, this general rule does not apply when one of

-54-

the alternative theories submitted to the jury rests on an unconstitutional or legally flawed premise. See Skilling v. United States, 130 S. Ct. 2896, 2934 (2010) (citing Yates v. United States, 354 U.S. 298 (1957)); Hedgpeth v. Pulido, 555 U.S. 57, 60 (2008) (per curiam). In such cases, we can affirm the conviction only if we conclude "beyond a reasonable doubt" that "the jury verdict would have been the same absent the error." Neder, 527 U.S. at 17; cf. Hedgpeth, 555 U.S. at 61 (Neder harmless-error analysis applies to alternative-theory errors).

Here, we find that sufficient evidence supported the charge that Wei misrepresented her employment history on her Green Card application to hide her previous visa violations. And since the jury instructions with regard to the second theory were neither unconstitutional nor otherwise fatally flawed, Wei's conviction for immigration fraud must stand.

The statute, 18 U.S.C. § 1546(a), makes it a felony to submit false information on an application for a visa or other immigration document. The statute "unambiguously extends a mens rea requirement" of knowledge, United States v. Villanueva-Sotelo, 515 F.3d 1234, 1239 (D.C. Cir. 2008), cert. denied, 556 U.S. 1234 (2009); see also United States v. Archer, 671 F.3d 149, 154 (2d Cir. 2011), and it only applies to false statements with respect to "material" facts. United States v. Boskic, 545 F.3d 69, 85 (1st Cir. 2008), cert. denied, 555 U.S. 1175 (2009). A false statement

on an immigration application is "material" if "disclosure of the
true facts would have led the government to make an inquiry that
might have uncovered other facts" that might lead to denial of the
application.  United States v. Fedorenko, 597 F.2d 946, 951 (5th
Cir. 1979); see also Kungys v. United States, 485 U.S. 759, 770
(1988).

       Applicants for a Green Card must submit a form listing
their employment history over the previous five years.  When Wei
filled out this form in 2002, she only listed her employment at
Chitron from May 1998 onwards (the month in which she was issued an
employment authorization card).  She omitted any mention of her
work at Perfect Science, as Chitron's branch office in
Massachusetts was formerly known, even though she had been under
contract to run the branch office from June 1996 onwards.

       Wei argues that her work for Chitron before May 1998 was
as a "volunteer."  While it is true that volunteer work need not be
reported as employment for Green Card application purposes, the
jury could reasonably conclude that Wei was no volunteer.  The
contract she signed with Wu in June 1996 provided her with a 5
percent stake in Chitron "[a]s a compensation."  While the contract
did designate Wei as a "volunteer," the fact that she was receiving
stock-based compensation in exchange for her services clearly
belies that designation.

-56-

The government also introduced a May 1997 e-mail from Wei to Wu in which she mentioned that a lawyer had told her that her work for Wu's company might violate the restrictions of her student visa. A reasonable jury could rely on this e-mail as evidence that Wei possessed the requisite <u>mens rea</u> for immigration fraud. As for materiality, Wei's own attorney read into the record a statement from the U.S. Citizenship and Immigration Services adjudicator who handled Wei's case; the adjudicator stated that if she had known that Wei's employment history was incomplete or inaccurate, that would have "trigger[ed] further investigation." This alone is enough to render the false statement "material," since a further investigation could have revealed that Wu and Wei were not in compliance with U.S. export laws. <u>Cf.</u> <u>Fedorenko</u>, 597 F.2d at 951.

Thus, an ample evidentiary foundation supports the charge that Wei lied about her past employment on her Green Card application. Her conviction must stand unless the instructions regarding the government's alternative theory of immigration fraud--that Wei lied about her intent to violate export restrictions--were unconstitutional or otherwise invalid. While Wei argues that the errors inherent in the Munitions List instructions necessarily infect the immigration count, we reject this suggestion.

The question which led us to vacate the Munitions List convictions is separate from whether, as of September 2002, Wei

-57-

lied about whether she _intended_ to violate the Munitions List restrictions. One can intend to violate a law on Date 1 without actually violating that law on Date 2, just as one can violate a law on Date 2 without having intended to do so on Date 1. Accordingly, if the jury convicted Wei of immigration fraud because it thought she intended, as of September 2002, to violate the Munitions List controls, the immigration fraud conviction could stand regardless of whether Wei ever did ship Munitions List-restricted parts to China.

Wei also argues that the Export Administration Regulations (which include the Commerce Control List) do not qualify as laws "prohibiting" the export of any goods because the EAR merely requires a license under certain circumstances. There is no basis for the argument. Wei was convicted of violating a provision of the EAR entitled "General _Prohibition_ One," _see_ 15 C.F.R. § 736.2(b)(1), which forbids the shipment of dual-use parts to specified countries without a license.

Since sufficient evidence supports at least one of the two theories on which the government charged immigration fraud, and since Wei has identified no fatal flaws in the instructions regarding the other theory of immigration fraud, our inquiry into this count is at an end.[16]

---

[16]We also reject Wei's argument that the district court deprived her of her constitutional right to present a defense by excluding an ostensibly exculpatory e-mail. Wei sought to

V.

Wu separately alleges that the district court violated his Sixth Amendment right to self-representation when it denied his request for a continuance so that he could prepare to conduct the case on his own, and later denied his related request to hire new trial counsel. The district court was entirely reasonable in its handling of Wu's last-minute request to change attorneys, and we reject this argument.

---

introduce an e-mail that she sent to an attorney in January 2003 seeking the name of a lawyer with expertise in export control regulations. In the e-mail, Wei said that Chitron "always follow[ed] the rules" and did not "want to do any illegal business" but that "sometimes we are not 100% sure about the law." When Wei's trial counsel sought to introduce the e-mail into evidence during direct examination of Wei on the twentieth day of the trial, the prosecutor objected that the defense had not shared this e-mail with the government until the morning of Wei's testimony. During a sidebar conference on the issue, before the district court issued any formal ruling on the objection, Wei's counsel volunteered: "I'm not going to sneak it up on them, Judge. I won't use it."

The next day, during the government's cross-examination of Chitron compliance officer Bo Li, the government asked Li whether he was "privy to any discussions with Chitron's lawyer about compliance policy," and Li said he was not. Wei's counsel argued at sidebar that the questioning of Li "opened the door" to the e-mail, but the district court rejected the defense lawyer's renewed request to introduce the message into evidence.

The district court's handling of this issue was entirely proper. Notably, the initial decision not to introduce the e-mail was made by Wei's counsel, not the district court. Nor did Li's testimony "open" any "door": Li did not join Chitron until 2005, and there is no suggestion that Li was privy to the January 2003 correspondence. The right to introduce evidence in one's defense is subject to reasonable restrictions, see Evans v. Verdini, 466 F.3d 141, 148 (1st Cir. 2006), cert. denied, 549 U.S. 1351 (2007), and the district court certainly had the discretion to disallow the e-mail on Day 21 of the trial after Wei's counsel had already withdrawn his request to introduce it.

On the nineteenth day of the trial--the day after the prosecution rested its case--Wu informed the district court for the first time that there were "a lot of issues" between himself and his trial counsel, and that he did not think that his attorney "represented [his] best interest." When asked to explain the source of the disagreement, Wu responded simply that he and his lawyer "ha[d] many fundamental disagreements about this case." The court told Wu that it could not start the trial all over again based only on that explanation, and suggested that Wu think it over and that it would discuss the matter with him at the end of the day.

That afternoon, the court again asked Wu to explain the nature of his disagreements with trial counsel. At first, Wu expressed the same vague concerns that he had raised earlier. When the court again pressed him to say more, Wu claimed that his lawyer had not shown the jury the right pages of certain exhibits, that he had failed to call two potential witnesses, and that he had not elicited important evidence from two witnesses who had already testified and whom Wu wanted to recall for further questioning.

The district court explained to Wu that he had an absolute right to counsel, but that at this stage of the proceedings, it was too late to give him a continuance to find a new attorney based on the kind of "dilatory" complaints he had raised. The court offered Wu three choices: he could proceed pro

-60-

se, he could continue with his trial counsel as his attorney, or he could represent himself with that counsel assisting as standby counsel.  Wu asked for a three day continuance to find a new attorney.  The court denied Wu's motion and suggested that he speak to the duty federal defender in order to think through his options. Wu accepted this proposal.

The next morning, the trial's twentieth day, Wu told the district court that he had decided to represent himself with the assistance of the duty federal defender.  The court explained to Wu that it could not appoint him a public defender because he was not indigent, but that it would consider allowing him to hire a new attorney to serve as standby counsel if he could find one.  In the meantime, Wu could proceed pro se with his current attorney as standby counsel.  Wei's attorney then explained that if Wu would be representing himself going forward, Wei would move to sever, due to the "spillover effect" it would have on her defense.

Given this new complication and the importance of keeping the jury's attention after twenty days of trial, the district court delayed ruling on the issue until the end of the day, while the witness on the stand continued to testify.  Wu then declared that he wanted to question the witness himself, without any standby attorney.  The court explained that Wu could not do that until it made its decision on his motion to proceed pro se, and suggested

that in the meantime he write down any questions that he thought his lawyer should have asked of the witness.

Instead, Wu announced that, "[I]f that's the case, I would like to keep [my current lawyer] as my attorney. I don't have a choice." The court asked Wu if he was sure he would like to keep his attorney, and Wu affirmed that he would proceed with his current lawyer "for the rest of the trial." The trial continued in accordance with Wu's decision. At the end of the day, Wu's counsel reminded the court of Wu's initial request to represent himself. The court noted that Wu had twice confirmed that he wanted to proceed with his current lawyer, and asked Wu if that was still the case; Wu responded that it was. Wu did not raise the issue again.

Wu had an absolute right to self-representation so long as he made his request "clearly and distinctly prior to the beginning of trial." United States v. Noah, 130 F.3d 490, 497 (1st Cir. 1997). But once trial was under way, Wu's right to self-representation became qualified, see id., and the district court had "considerable discretion" to grant or deny Wu's request to act as his own lawyer. Id. at 498. We review such decisions for abuse of discretion, mindful that, after trial has begun, "[t]he right to select or refuse specific counsel is always subject to practical courtroom constraints." United States v. Betancourt-Arretuche, 933 F.2d 89, 93 (1st Cir.), cert. denied, 502 U.S. 959 (1991).

There was no abuse of discretion here.  A district court

considering a mid-trial request to proceed pro se "must balance the

legitimate interests of the defendant in self-representation

against the potential disruption of the proceedings already in

progress." Noah, 130 F.3d at 498 (quoting Williams v. Bartlett, 44

F.3d 95, 99 n.1 (2d Cir. 1994)).  In this case, the district court

made every effort to inquire into the extent of Wu's disagreements

with his attorney, and then to accommodate Wu's complaints and his

desire to proceed pro se within the constraints of a complicated

and lengthy trial.  Ultimately, the court made a reasonable

judgment in concluding that the disruption that would result from

delaying trial and severing Wei's case outweighed Wu's qualified

interest in self-representation. Betancourt-Arretuche, 933 F.2d at

94 ("trial court has extensive discretion over 'eleventh-hour'

requests for continuances in order to substitute counsel").[17]

_____

[17]Wu also argues that the district court violated his Sixth
Amendment right to confront the witnesses against him and to
present a complete defense when it denied his request to recall for
further questioning two witnesses who had already testified.  In
fact, however, Wu never moved to recall these witnesses at all--he
simply expressed the desire to recall them in the context of
explaining to the district court why he was unhappy with his
attorney's performance.  Nor did the district court deny any
request to recall witnesses.  It merely explained to Wu that his
lawyer could not recall those witnesses.  Regardless, the Sixth
Amendment "guarantees an opportunity for effective cross-
examination, not cross-examination that is effective in whatever
way, and to whatever extent, the defense might wish." Stephens v.
Hall, 294 F.3d 210, 226 (1st Cir. 2002) (quoting Delaware v. Van
Arsdall, 475 U.S. 673, 679 (1986)), cert. denied, 537 U.S. 1129
(2003).  Wu received that opportunity and the court was not
constitutionally required to give him a second chance. See id.

VI.

Accordingly, we _affirm_ Wu and Wei's convictions on the Commerce Control List counts (Counts 7, 12, 15, 16, 17, 18, and 19), the conspiracy count (Count 1), and the SED counts (Counts 31 and 32). We also _affirm_ Wu's convictions on the additional Commerce Control List counts (Counts 21, 22, 23, 25, and 27), and _affirm_ Wei's conviction on the immigration count (Count 34). We _vacate_ both defendants' convictions with respect to the Munitions List counts (Counts 4 and 5).

We have said that "[w]hen a defendant successfully challenges one of several interdependent sentences, the proper course often is to remand for resentencing on the other (nonvacated) counts." _United States_ v. _García-Ortiz_, 657 F.3d 25, 31 (1st Cir. 2011), _cert. denied_, 132 S. Ct. 1126 (2012). We believe that such a course is appropriate here. "[T]he authority to reshape a sentence when multicount convictions garner mixed reviews on appeal--some affirmed, some reversed--looms as an integral component of the trial judge's broad sentencing discretion." _United States_ v. _Pimienta-Redondo_, 874 F.2d 9, 14 (1st Cir.) (en banc), _cert. denied_, 493 U.S. 890 (1989). Thus, we _remand_ to the district court for further proceedings consistent with this opinion, including--as the district court deems appropriate--proceedings to resentence the defendants on the counts for which we have affirmed their convictions.

So ordered.

-64-